Argued at Pendleton, May 7, affirmed June 26, 1923.

## HANNA *v.* HOPE ET AL.

(216 Pac. 178.)

**Vendor and Purchaser—Evidence Held not to Show Vendor's Misrepresentation as to Amount of Water Available for Irrigation.**

In purchaser's suit to quiet title, in which vendors asked for foreclosure of mortgage, cancellation of which plaintiff prayed because of failure of consideration to that extent, evidence *held* not to show vendors' misrepresentations as to the amount of water available for the irrigation season.

From Malheur: DALTON BIGGS, Judge.

In Banc.

This is a suit brought by George W. Hanna against M. G. Hope and I. W. Hope. Sarah Hanna, the wife of the plaintiff, was, upon the application of the Hopes, joined as a party defendant. The plaintiff brought this suit as one to quiet title. The Hopes answered by setting up notes signed by plaintiff and wife and prayed for a foreclosure of the mortgage given to secure the notes. The plaintiff, relying on the rule announced in *Foss* v. *Newberry,* 20 Or. 257 (25 Pac. 699), replied by alleging fraudulent representations causing damages and prayed for a decree annulling the notes and mortgage because of the damages. The notes signed by the plaintiff and his wife were purchase-money notes, and she signed the mortgage so that the instrument would cover her possible dower right. The real contest, however, is between George W. Hanna on the one side and the two Hopes on the other side. The trial court decreed that the Hopes have and recover $28,303.45, the amount due on the notes, together with attorney's fees, and that the mortgage be foreclosed by a sale of the land, but that the Hopes "have no judgment over for any deficiency," for the reason that the notes were purchase-money notes. The plaintiff appealed.

This case was first presented to this court on questions of pleading. *Hanna* v. *Hope,* 86 Or. 303 (168 Pac. 618). After the cause was remanded the parties introduced evidence; and the present appeal is from the decree which was based upon that evidence.

The complaint as already explained is in the form of a complaint to quiet title. The complaint prays for a decree quieting the title to the 160 acres involved in this litigation.

The Hopes answered by denying that they claimed any interest in the land except the interest created by a mortgage given to secure six promissory notes signed by the plaintiff and his wife. For affirmative relief the Hopes allege that on August 1, 1911, the plaintiff and his wife executed and delivered to the Hopes a promissory note for $15,000, payable five years after date with interest at the rate of 8 per cent per annum, and at the same time "and in lieu of interest on and before maturity" of the note for $15,000, the plaintiff and his wife executed and delivered five notes "called interest notes," payable respectively 1, 2, 3, 4, and 5 years after August 1, 1911. The answer recites that the plaintiff and his wife secured the notes by giving a mortgage on 160 acres of land; and it is then alleged that none of the notes have been paid and taken up except the first interest note and that no payments have been made on any of the other notes except $180 paid on the second interest note. The Hopes asked for "a judgment" against the plaintiff and his wife for the amount due on the notes, together with attorney's fees, and prayed for a decree foreclosing the mortgage.

The second amended reply filed by the plaintiff avers that the notes and mortgage

"were executed and delivered as and for a part of the purchase money of the real property described in the complaint, and in said mortgage, 'Exhibit A,' together with certain water rights by defendants represented as appurtenant to said lands, to wit: Sufficient water to properly and reasonably irrigate

said lands in an amount, if necessary, to the extent of 250 inches, miners' measurement during the irrigating season of each and every year, said water being supplied to and for said lands by means of supply ditches under the control of The Mill Ditch Company, a corporation.''

The reply continues by averring that the plaintiff was induced to purchase the 160 acres of land ''with such water rights appurtenant thereto'' by means of false and fraudulent representations made by the Hopes. The plaintiff alleges that the Hopes

''represented to plaintiff, that water of sufficient quantity to seasonably and properly irrigate all of said lands was actually appurtenant to and provided for said lands, together with supply ditches actually provided to deliver such water upon said lands, and that such supply was provided by defendants and secured from the said The Mill Ditch Company, and was available therefrom.

''That the right to use 250 inches, miners' measurement of such water supply was appurtenant to said lands.

''That the defendants would transfer and deliver to plaintiff, a certificate issued by said The Mill Ditch Company representing and entitling plaintiff to use 250 inches of water upon said lands, each year, or a sufficient amount of water to properly and seasonably irrigate said lands, to be used, each year, for the beneficial purpose of irrigating said lands.

''That the defendants owned said lands and said water rights, and knew, and had reason to know, that there was such supply of water provided and available for such purposes and in such amount, and that the same was appurtenant to said lands.

''That the plaintiff was, at said time, a stranger to the locality wherein such lands were situate, and was unacquainted with the peculiar conditions of the country wherein said lands were situate, and had

no knowledge of the extent or amount of water supply available and necessary for irrigating of said lands, excepting the representations thereof so made by defendants, all of which defendants then had knowledge."

The plaintiff further alleges:

"That, notwithstanding said representations so made by defendants to plaintiffs that there was, neither at the time of said sale and purchase, or at any time thereafter, nor now, or at any time at all, was there any water rights appurtenant to said lands, or water supplied or available for said lands, to properly and seasonably irrigate any part of said lands during the entire season for irrigating said lands in any amount, or at all, and plaintiff avers and alleges that at no time during the season for irrigating said lands was there more than fifty inches miners' measurement, of water supplied or available for said lands from said represented source of water supply, or from any other water supply, for irrigating said lands or any part thereof, and such amount was only procurable and available for a few days' time during the early part of the season for irrigating said lands, and that during such times, that the said supply was uncertain and intermittent, with the result that said lands were, virtually, worthless and useless for the purposes for which they were sold and purchased to wit: For the raising of alfalfa, grain, grasses, pasture, and also vegetables, trees and general agricultural crops; * *

"That the seasons for irrigating said lands commence about April 15th and end about September 15th, of each and every year.

"That the said The Mill Ditch Company never has had a water supply available for use in irrigating said lands in the amount of 250 inches, miners' measurement, nor in any amount, during the season for irrigating said lands, each year, nor at all, but that said company's water supply was, and is only

available during the early part of said irrigating seasons and at no time in an amount of more than fifty inches of water for use upon said lands, all of which was known to the defendants at the time of the purchase and sale of said lands; and was unknown to the plaintiff at such time."

It is further averred that the 160-acre tract purchased by the plaintiff is irrigable land

"and without the water supply and rights appurtenant thereto as so represented by the defendants, or water supply sufficient for use in properly and seasonably irrigating them, they are of but little value, and practically worthless, for the purposes for which they were sold and purchased; and that with the limited supply available, as above set forth, are of no greater or reasonable value for any purpose, than Four Thousand Dollars ($4,000), but that said lands, with the water supply and water rights appurtenant thereto and the supply available therefor as so represented by defendants to plaintiff at the time of said sale and purchase, would have been, at said time, and now worth and of the reasonable value of Twenty Thousand Dollars ($20,000), the consideration agreed therefor, between plaintiff and defendants, for the purposes for which they were sold and purchased."

The plaintiff asserts that the consideration, to the extent of $16,000 has failed; and he therefore prays for a decree annulling the notes and mortgage.                                   AFFIRMED.

For appellant there was a brief over the names of *Mr. Stephen A. Lowell* and *Mr. C. M. Crandall,* with an oral argument by *Mr. Lowell.*

For respondents there was a brief over the name of *Messrs. Davis & Kester,* with an oral argument by *Mr. George E. Davis.*

HARRIS, J.—The plaintiff owned thirteen acres of land near Pendleton in Umatilla County. The Hopes owned 320 acres of land located about two miles northeast from Vale in Malheur County. We understand that this 320-acre tract is arid and that it cannot be farmed profitably unless it is irrigated. Near Vale the Malheur River runs in a northeasterly direction. A ditch known as the Mill ditch taps the Malheur River at a point about one and one-half miles south and a little west of Vale. The ditch runs in a northerly direction to and through Vale and then continues in an easterly direction to and through the 160-acre tract purchased by the plaintiff from the Hopes and thence in an easterly direction for a distance of about five miles to its end. According to a map found in a pamphlet received in evidence and entitled "Oregon Cooperative Work" the Mill ditch is about ten miles long. As originally constructed the Mill ditch terminated at Vale where the water conveyed through the ditch was used for power purposes. A filing was made in 1897 by the Vale Milling Company and Vale Electric Light Company claiming the right to use 4,500 inches of water for irrigating, power and general manufacturing purposes. M. G. Hope signed this notice of water right as secretary of each company. Subsequently and in about 1903 the work of extending the ditch from Vale to its present terminus was begun with the view of conveying the water through the ditch for the purpose of irrigation. In November, 1902, Richard Williams and Frank High filed a notice claiming 250 inches of the waters of Malheur River for irrigation purposes; and in July, 1903, the Hopes filed a notice claiming 4,000 inches to be diverted through

the Mill ditch and to be used "in conjunction with the 4500 inches of water of said ditch for irrigation power and general purposes."

In 1905, M. G. Hope and two others signed articles of incorporation and caused to be incorporated a company known as "The Mill Ditch Company." According to the articles of incorporation the company proposed to purchase and maintain a ditch for carrying 4,750 inches of water. The capital stock was divided into 4,750 shares of the par value of $10 each. We understand from the record that 4,000 inches out of the 8,750 filed on "were retained for the power," and that upon the organization of The Mill Ditch Company the Hopes and others transferred to that corporation their respective rights in and to the ditch and water rights to the extent of 4,750 inches, and that persons owning land along the ditch were enabled to irrigate their lands by purchasing stock in the company. We also understand that the corporation was organized on the theory that it would acquire the above mentioned right to divert 4,750 inches of water and that therefore each of the 4,750 shares of stock would represent one of such inches of water. In brief the ditch was originally constructed to carry water to Vale for power purposes; but subsequently the ditch was extended through and beyond Vale for irrigation purposes. The record does not definitely inform us as to when the extension of the ditch was completed, but it does appear from the testimony of one witness that he irrigated from the ditch and raised a crop in 1905.

Other ditches diverted water from the Malheur River at points above and below the intake of the Mill ditch. Above the Mill ditch are the Vines

ditch, the Farmers' ditch, the J. H. ditch, the Mc-
Laughlin ditch, the Sand Hollow ditch, the Geller-
man-Froman ditch; and below the intake of the
Mill ditch is the point of diversion of the Nevada
ditch. "The Vines Ditch has a portion of a right
that is prior to that of the Mill Ditch;" and all
the remaining ditches mentioned are prior in right
to the Mill ditch. In the case of the *Nevada Ditch
Company* v. *Bennett,* 30 Or. 59 (42 Pac. 472, 60 Am.
St. Rep. 777), the Nevada ditch was awarded a
decree giving it priority over practically all of
the upper ditches and users of water. However,
neither the McLaughlin ditch nor the Mill ditch
was included in that decree; but subsequent liti-
gation between the Nevada ditch and the Mc-
Laughlin ditch ended in a decree favorable to the
latter. The Nevada ditch has a priority of 2,000
inches over all the ditches named, except the Mc-
Laughlin ditch; and the Mill ditch is inferior in
right to all of the ditches above named except
possibly a portion of a right belonging to the Vines
ditch. Whenever the volume of water reaching
the intake of the Nevada ditch is insufficient to
provide 2,000 inches for that ditch a representative
of the Nevada ditch notifies all the upper ditches,
except the McLaughlin ditch, to close their head
gates and to permit the water to pass on down
the river to the Nevada ditch. In other words
the upper ditches continue to divert water and are
enabled to furnish water for irrigation until the
Nevada ditch notifies them to close down. The
fact that the Nevada ditch required the upper
ditches to close down was "common knowledge."
The time for closing down was not the same each
year, but it varied. However, the upper ditches

were usually compelled to close early in July. Notwithstanding the fact that the Mill ditch is inferior in right to the other ditches, the flow in the river has been such that the Mill ditch has been permitted to take water from the river as long as all the upper ditches, except the McLaughlin ditch, have been permitted to do so. Testifying in December, 1918, L. J. Hadley stated that in the last fourteen years the Gellerman-Froman ditch had been compelled to close down "a year or two" as late as August, twice in June, and "the rest of the time was in July."

The Hopes have resided in or in the vicinity of Vale since 1884. They became the owners of the 320-acre tract at least as early as 1902 and possibly in 1900. In 1911, the Hopes were familiar with the Mill ditch, its rights and the extent of the use made of the water, and they had knowledge of the prior rights of the Nevada and other ditches; for they had been actively connected with the construction and maintenance of both the original ditch and the extension of it. The irrigation season covers a period beginning with about April 1st and ending not earlier than August; and hence if the Hopes or either of them represented that there was an abundance of water available for the irrigation of the 160-acre tract during the entire irrigation season it must follow that such representations were made with the knowledge that they were not true.

The plaintiff had irrigated his 13 acres of land with water pumped for that purpose, but aside from that he was without experience in irrigation and had but little knowledge of the conditions prevailing in the vicinity of Vale.

In May, 1911, the plaintiff went to Watson, a
place about 70 miles distant from Vale, and there
helped his brother-in-law Frank Palmer with the
latter's crops. Palmer had owned a house in Vale
for several years; he had crossed the Mill ditch
in Vale "hundreds of times"; and "during all the
time since the Mill ditch had been operated for
irrigation purposes" he had "noticed a failure"
of water which "has always come. along in May
and June, and July there is always a scarcity."
Palmer testified that he "always had an idea
that the shortage was caused by lack of water
in the river"; for it may be added that he in
common with the farmers in the valley knew that
the Nevada ditch had the first right and that
when the river "got low" the "Nevada ditch took
it all."

On July 20, 1911, the plaintiff and Palmer were
in Vale; and on that day M. G. Hope, who was
an officer of a bank in Vale, in conversation with
Palmer learned that Hanna was looking for a
location; and so Hope requested Palmer to intro-
duce Hanna to him as the Hopes were thinking
of selling the 320-acre tract owned by them. In
this connection it is proper to state that the Mill
ditch runs between Palmer's house and the bank
and that in going to the bank Hanna necessarily
crossed the ditch. Palmer took Hanna to the bank
and introduced him to M. G. Hope. Hanna claims
that it was then and there that M. G. Hope made
the alleged false representations.

M. G. Hope acting for himself and his brother
I. W. Hope told Hanna that they would sell 160
acres of the 320-acre tract, together with 250 shares
of stock in The Mill Ditch Company, for $125

per acre, aggregating $20,000. The Hopes had set aside 500 shares of The Mill Ditch Company stock for the 320-acre tract; and they "assigned" 250 shares of stock to each half of the 320-acre tract. Hanna explained to M. G. Hope that he could make no payment except by conveying his 13 acres to the Hopes. The plaintiff's property was figured at $6,000. The parties concluded that if the plaintiff purchased from the Hopes, the plaintiff would convey the 13 acres to the Hopes who would pay him $1,000 in cash and credit him with $5,000 on the purchase price of $20,000, and to evidence the remaining $15,000 Hanna would give his note for that amount payable five years after date with interest at 8 per cent per annum, and to evidence the interest payable on the $15,000 note he would give five notes with one of them maturing each year. It was also understood that all the notes should be secured by a mortgage on the 160 acres.

The conversation at the bank terminated with an understanding that I. W. Hope would take the plaintiff out the next morning and show the land to him. We shall not recite the alleged false representations until we narrate some more of the doings of the parties.

Pursuant to the understanding I. W. Hope and the plaintiff went to the premises on July 21st and at that time the plaintiff examined the 160 acres of land. The Mill ditch ran along the north side of the 160 acres involved here. In its original state the land was covered with sage brush. To make the ground ready for irrigation the sage brush must be cleared off and the surface of the land leveled. A part of the 160 acres had been

108 Or.—15

cleared, prepared for irrigation and sowed to alfalfa. Immediately east of the 160 acres purchased by Hanna was the other 160 acres or one half of the 320-acre tract owned by the Hopes. The Hopes were talking of selling this east half to H. S. Eldredge who owned and had been farming an adjoining ranch. South of the Hanna 160 acres was the Hess ranch; and the Harvey ranch also adjoined the 160 acres now in litigation. The Eldredge, Hess and Harvey ranches, or at least the two former ones were under the Mill ditch. The plaintiff knew that Eldredge was negotiating with the Hopes for one half of the 320-acre tract and 250 shares of stock in The Mill Ditch Company for $135 per acre; and it may be here stated that Eldredge had for a considerable period of time resided in that section and was fully acquainted with the history, capacity, and rights of the Mill ditch; and with this knowledge he paid $135 per acre for the 160 acres. It is conceded that I. W. Hope did not make any false representations whatever when the plaintiff viewed the premises. Moreover, no obstacle was placed in the way of the plaintiff, nor was any artifice or trick resorted to for the purpose of preventing the plaintiff from examining the ditch or the land. The plaintiff made a careful inspection of the land and the alfalfa growing on the land. He observed on July 21, 1911, that the alfalfa was very spotted; and although "there was alfalfa scattered over possibly 60 acres" the plaintiff and the Hopes, because of this spotted condition, figured the alfalfa at 40 acres in connection with the rebate on the interest hereinafter more fully described. He could see the conditions prevailing on the Eldredge, the Hess and the Harvey ranches. But he did not inspect the ditch. He made no inquiries of Eldredge or of

Hess or of Harvey, although he knew that Eldredge
was negotiating for 160 acres. The plaintiff crossed
the Mill ditch twice every time he went from Palmer's
house to the bank and back to the house. The
plaintiff and I. W. Hope returned to Vale and the
plaintiff said that he would purchase on the terms
already outlined if his son Walter Hanna, after an
inspection, should express his satisfaction with the
premises. Subsequently on July 25th the plaintiff
and his son Walter visited the land and made a
careful examination of the land and observed the
alfalfa and its condition; but they did not go to
the ditch and inspect it although they did inspect
the laterals. Walter was satisfied with the condi-
tions; and so the plaintiff upon returning to Vale
expressed his readiness to buy. The next day the
plaintiff and I. W. Hope proceeded to Pendleton
to enable the latter to examine the 13 acres owned
by the plaintiff. I. W. Hope was satisfied with the
13 acres and upon returning to Vale the necessary
documents were prepared.

It is conceded that the notes, the deed to Hanna
and the mortgage from the Hannas to the Hopes
were all prepared and ready for signing on August
1, 1911. The acknowledgment to the mortgage pre-
pared by the notary public is dated September 9,
1911, probably due to the fact that the plaintiff's
wife did not arrive in Vale until after August 1st.
At any rate the plaintiff admits that he signed
the notes and mortgage on August 1, 1911. Refer-
ence to these legal documents and to the date of the
execution of them is important only to the extent
that they are connected with the plaintiff's claim
that a written contract reciting the terms of the
agreement had been prepared and was signed by him

and by the Hopes or at least by M. G. Hope on August 1, 1911, at the same time the plaintiff signed the notes and mortgage.

As already explained the interest amounting to $1200 each year on the principal note was evidenced by interest notes, the first maturing one year after date and the second falling due two years after date. Some sort of an arrangement was made whereby a rebate on the interest should be allowed. Hanna says that this arrangement applied to the first two seasons. It was contemplated that the plaintiff would prepare for irrigation all the land which at that time was covered with sage brush; that it would require about two years in which to do the work; and that interest should be paid on the basis of the cultivated land. Most of the first interest note was paid by the rebate allowed pursuant to this arrangement. The agreement so far as it related to the allowance of a rebate was carried out. It was in connection with this rebate that the plaintiff and the Hopes figured the spotted alfalfa at 40 acres.

Immediately upon signing the notes the plaintiff took possession of a part of the 160 acres and began the construction of buildings; and subsequently he took possession of all the premises. The plaintiff farmed the land during the season of 1912 and each year thereafter until the beginning of this suit in July, 1916.

The plaintiff says that the ditch did not deliver to him sufficient water to enable him properly to irrigate his alfalfa and grain, and that instead of being furnished with 250 inches, or even an inch per acre, the most that he could obtain at any time was about 50 inches except when he received

about 70 inches for a brief time, and that in July or earlier each year the Mill ditch was closed on account of the demands of the Nevada ditch. The issue for decision is of course whether M. G. Hope did or did not make representations as alleged by the plaintiff. It would be impossible to give a detailed account of all the pertinent facts disclosed by the evidence or an itemized statement of the deductions to be drawn from the evidentiary facts, taken singly or in combination, without unduly extending the length of this already long opinion; and we shall therefore do no more than to refer to some of the most salient features of the case.

At this point it should be stated that the plaintiff concedes that the land is in every respect equal to the representations made by M. G. Hope. The only complaint made by the plaintiff is in reference to the water. As already explained the alleged false representations concerning the water were made by M. G. Hope on July 20, 1911, during the conversation at the bank, or else they were not made at all. In substance the plaintiff claims that M. G. Hope told him that there was an abundance of water for the land during the entire irrigating season; that each of the 250 shares was good for an inch to the share through the months of April, May, June and July; that while "sometimes in July we might look for a shortage," by reason of "my having 250 shares that the *pro rata* would make an abundance for that land"; that M. G. Hope spoke about the Nevada ditch "having a prior right to some water" but he did not say that it was for 2,000 inches or for any other definite quantity, although he said that it was "for a small amount of water, it wasn't enough to amount to anything."

The trial court found as a fact:

"That neither of defendants at any time made any false or fraudulent representations as to said land, nor as to the water right appurtenant thereto, to induce plaintiff to purchase said land, nor otherwise, but on the contrary truthfully represented the same to plaintiff as to its priority and quantity of water, all of which could have been verified by plaintiff by the exercise of any degree of diligence by inquiry of any person residing in the vicinity of the land or almost anyone in the town of Vale."

The trial court also filed a written opinion in which, after a discussion of the evidence, he observes that he

"cannot accept the conclusion that defendant Hope represented to the plaintiff Hanna that there was an abundant water right for the entire season first, because it is too improbable, the facts were wholly to the contrary. The record not only discloses the facts as here presented, but it also discloses the fact that it was publicly known that all of these ditches turned down to the Nevada Ditch along about the first of July; indeed it is even admitted by the testimony of the plaintiff and Frank Palmer, that some such statement as that was made. That being true, a man of ordinary prudence would certainly not have stated in the next breath, after saying that it was necessary to turn down to the Nevada Ditch, that he had an abundant water right the full season through, and that any number of shares of stock could supply the shortage that occurred after the first day of July. None of the ditches, not even the Nevada Ditch itself, had an ample supply after the first day of July, or after the usual summer shortage occurred; nor did the first ditch on the river, the McLaughlin Ditch, have such a right. This fact being known to the public generally would have been disputed by the first

man that was inquired of in regard to this on the street. Consequently a man of ordinary prudence would certainly not make a statement which was so liable to immediate contradiction. It seems to me, under the state of the record, that this would be wholly improbable, that such a statement as that could have been made by defendant Hope during the negotiations for the sale of this tract of land. Indeed, it seems reasonable, and I have come to the conclusion after a careful consideration of all of the evidence, that the burden of Mr. Hope's argument was to convince the plaintiff that the water right in the Mill Ditch was practically, though not theoretically, as good as the right of all of the other ditches up the river except the Nevada and Mc-Laughlin, and this in a large measure was true, because we have seen before, the testimony amply discloses than on account of the abundance of early water and the sudden drop in the Malheur River, it became necessary for all of these later rights to turn down to the Nevada Ditch at about the same time. This has been the practice and the custom of all of the ditches covering a long period of years.''

A careful examination of the entire record prevents us, as it did the trial judge, from accepting the conclusion that M. G. Hope represented that there was an abundance of water for the entire season, for the reason, among others, that the probabilities are against such a conclusion. Hope had been familiar with and connected with the Mill ditch throughout its entire existence. He and his brother acquired the 320-acre tract before the Mill ditch was extended and as owners of that land they had irrigated portions of it with water taken from the Mill ditch. M. G. Hope had owned interests in some of the upper ditches and knew of the relative rights of the ditches. Frank Palmer in common

with others knew that the Nevada ditch had a priority. The fact that the lawful demands of the Nevada ditch took all the water when the water fell to low water mark in July or earlier was a fact so well known as also to be common knowledge. Palmer himself says that "between 16 and 17 years" he had observed a shortage in the Mill ditch "come along in May and June, and July there is always a scarcity," and that he "always had an idea that it was lack of water in the river." Palmer and Hanna both say that before Hanna talked with Hope, Palmer said to Hanna that the country down there, meaning the section where the 320-acre tract is located, always looked like a "dry lay out" to him; and they further say that this statement was related to Hope on July 20th and that Hope explained that "if it is a dry looking lay out," the reason for it is that some of the owners "insist on irrigating 160 acres and only have 40 or 50 shares." The plaintiff and Palmer claim that Hope explained that Hanna would be situated differently because he would have 250 shares and that his *pro rata* would give him sufficient water despite the shortage. Now it would have been most extraordinary if Hope made the representations attributed to him by the plaintiff, because Hope could not but have known that the moment Palmer and the plaintiff left the bank Palmer would contradict such representations; and moreover Hope knew that Hanna intended to view the premises on the 21st of July, a time when he could see with his own eyes that the ditch was not delivering an abundance of water. Hope could not but have known that even though Palmer had remained silent, any inquiry by Hope would inevitably have

revealed the fact that the demands of the Nevada ditch compelled the Mill ditch to close down.

M. G. Hope denies that he represented that the ditch carried an abundance of water during the entire irrigating season. He says that he told Hanna that 250 shares to the 160 acres "was more shares than anyone else in the ditch owned for a like amount of land, and that * * I thought that would supply about 160 flowing inches in the ditch." He also testified that he told Hanna that the Nevada and McLaughlin ditches had prior rights, but that the custom had been to close down the ditches when ordered by the Nevada ditch and that he considered, in view of "the way it had been handled," the Mill ditch right was as good as any of the other ditches except the Nevada and McLaughlin. Hope states that he informed Hanna of the priority of the Nevada ditch and that in compliance with notice from the Nevada ditch the Mill ditch and the other upper and inferior ditches "closed down about the first of July, sometimes a little bit earlier than that, sometimes a little later, but that was about an average of when they had been closing the ditches down." The testimony of Hope that he did not represent that the Mill ditch had an abundance of water throughout the irrigating season was necessarily corroborated by Frank Palmer when he testified that Hope said:

"The Nevada Ditch had a prior right and that sometimes in July the water was short and he would have to close down this ditch on account of the shortage of water."

Indeed, when Palmer was asked whether Hope stated that there was an abundance of water for the entire irrigation season, he answered: "Not that

I know of." That an abundance of water was not
furnished throughout the entire season was neces-
sarily made known to Hanna when he inspected the
alfalfa on July 21st. I. W. Hope says that he
"told Hanna in connection with the amount of
water that he would get, that he was getting more
shares of stock than any of the rest, and if the
rest maintained the ditch so they could get their
necessary amount of water for the land he would
surely have the necessary amount for his."

The evidence makes it clear that the plaintiff
did not receive an abundance of water, nor an inch
per acre. However, the shortage of water occurring
prior to the closing down of the Mill ditch was in
a large measure due to the fact that the diverting
dam was out of repair much of the time and to the
further fact that apparently only a part of the stock-
holders were willing to work on the dam and ditch
or to advance funds with which to pay for such
work. The dam was not a permanent one; and
naturally every spring a part of the dam washed
away. The dam could not then be repaired until
the water had fallen sufficiently to enable the work
to be done; and the result was that by the time
the dam was repaired the opportunity for divert-
ing an abundance of water into the ditch had been
lost. Some of the testimony of Walter Hanna is
significant. He stated that in April and June the
water was getting low and that "it wasn't coming
into the ditch. There was breaks in the dam and
one thing or another to let the water get by, and
in June, I guess it was, the water got so low we
couldn't chink it up close enough to get the water."
He further testified that certain ditches were above
and that "if they took out the water it couldn't

come down. * * But at the same time I always figured there was enough water came down that river up until about in July for the stockholders that held this stock, if they would go out and throw some rocks in the river there, and put in a dam, that wasn't all brush that they could control it better.'' The plaintiff admitted it was partly a question of putting the dam and ditch in shape. W. C. Faubion, a witness for the plaintiff, stated:

''Of course there was different times that the dam was not in shape when they had plenty of water in the river that we had a scarcity of water in the ditch.''

Based upon this and other evidence the trial court made the following finding:

''That there was and is appurtenant to said land a water right through what is known as the Mill Ditch, a mutual ditch corporation, which owned a canal of sufficient capacity to carry sufficient water to all the irrigated lands under it so long as the water was available in Malheur River, if the users kept the dam in repair to divert the water into their canal.''

The plaintiff contends that the supposed written agreement recited the terms of the purchase including the recital about ''an abundance'' of water; but the evidence persuades us to believe that there was no written agreement and that the plaintiff is mistaken as a result of one of those inexplicable tricks which memory sometimes plays upon any of us.

The trial court further found that with the water right then appurtenant to said land represented by 250 shares of stock in the Mill Ditch Company it

was of the reasonable value of $20,000, the price plaintiff agreed to pay for the same.

While all persons might not agree with the finding last quoted, it may be noted, in this connection, that when Mrs. Hess "a year or two ago" applied to the Federal Farm Loan Bank of Spokane for a loan the appraisers, according to one witness, valued the Hess land at either $100 or $125 per acre for loan purposes, and according to another witness at $100 for the alfalfa and $75 per acre for the unimproved land. The plaintiff says the Hess place "is just about such a place as mine." The Eldredge and Harvey ranches were likewise appraised at $100 per acre for the alfalfa land, while the Eldredge unimproved land was appraised at $75 and the Harvey unimproved land at $65 per acre.

There is also testimony to the effect that more alfalfa to the acre was raised both before Hanna took possession and also the year he lost possession than during the time when he farmed the premises.

The record has been read and most of it re-read, and it has all been considered with a full realization of the unfortunate position in which an adverse decision leaves the plaintiff; but we are unable to agree with the contention of the plaintiff. It follows, therefore, that the decree must be affirmed; but we think that neither the plaintiff nor the defendants should recover costs and disbursements in this court.

                                                        AFFIRMED.